Laura Carter Higley, Justice
Appellant, Gustavo Uriel Sandoval, was found guilty by a jury of the offense of family-violence assault, enhanced by a prior conviction. The trial court assessed punishment at four years imprisonment. In one issue, Appellant contends that the trial court abused its discretion when it did not permit Appellant's trial counsel to ask prospective jurors during voir dire whether they needed "to hear from the victim" to convict Appellant for family-violence assault.[1]
We affirm.
Background
Tiffany B. and Appellant began a romantic relationship around 2007. The couple then had a daughter, S.B.
In 2013, Appellant was convicted of the offense of "continuous violence against the family" based on assaultive conduct Appellant committed against Tiffany. Over the *395 years, Appellant was also charged four other times with assaulting Tiffany, but the charges were dismissed.
In May 2016, Tiffany and eight-year-old S.B. lived in an apartment in Austin, Texas. On the morning of May 10, Tiffany entered the apartment complex's leasing office. Tiffany was crying and upset. She told the manager of the apartment complex that her daughter's father had beaten her and broken her cell phone. Tiffany asked to use the office's phone to call 9-1-1. In the 9-1-1 call, Tiffany reported that Appellant had "beat[en] her up" and "destroyed all [her] stuff," including her cell phone.
When the police arrived, Tiffany was crying and distressed. She told them that Appellant had tried to climb through her window earlier that morning, and she had told him to leave. Tiffany had then taken S.B. to the school bus. When she returned home, Appellant was in her apartment. She reported to the police that Appellant struck her numerous times and dragged her. Appellant then choked her for approximately eight seconds, causing her to have trouble breathing and to feel faint.
The police photographed Tiffany's injuries. The photos show that Tiffany had red marks, scratches, and bruising on her neck, face, and abdomen. One of her fingers nails was broken and bloody, and she had ruptured blood vessels in her eyes. The police also photographed Tiffany's television and cell phone, which were broken.
Appellant was arrested and placed in jail. Appellant called Tiffany from jail, and the calls were recorded. In the first call, Appellant repeatedly told Tiffany that he loved her and that he thought they would live "happily ever after." Tiffany told Appellant "I can't, I can't." She indicated to him that he had been "worse than ever."
In the next call, Appellant told Tiffany that he was being made to "look bad" like a "monster." He told Tiffany that the State would claim that he was pressuring her by calling her. Tiffany indicated to him that she had already told the authorities that he was not pressuring her. Knowing that the calls were recorded, Appellant said that they would probably try to use the phone calls against him.
Appellant also told Tiffany that only they knew what had happened. Appellant acknowledged that he had broken the cell phone and television, remarking that he had paid for them.
During the call, Appellant described what had happened during the incident. He said that Tiffany had been the aggressor that morning. He claimed that Tiffany had scratched him because she had not wanted him to leave. Appellant told Tiffany that she must have scratched herself. Appellant also told her that his attorney indicated that it was good that she was on his side.
Tiffany did not cooperate with the investigation or prosecution of the case. Detective C. Bushnell, who worked in the domestic violence unit of the Austin Police Department, was assigned to investigate the alleged assault. He was never able to speak with Tiffany, but she left four voice mail messages for him telling him that she did not want criminal charges filed against Appellant. Tiffany also signed several affidavits of non-prosecution, requesting that the district attorney's office not pursue charges and dismiss the case. Despite Tiffany's requests, the State pursued charges against Appellant, and he was indicted for the offense of family-violence assault. Because of her non-cooperation, the State issued a subpoena for Tiffany to testify.
The case proceeded to trial. During voir dire, Appellant's counsel asked prospective jurors as follows: "[D]o you-all need to *396 hear from the victim in order to convict a person of family violence?" The State objected that the question was an improper commitment question, and the trial court sustained the State's objection.
Although she had been subpoenaed, Tiffany did not appear on the first day of trial. The State proceeded with its case by offering other evidence. Among its evidence, the State offered Tiffany's 9-1-1 call, the police photographs showing the abrasions and bruising on Tiffany, and two recorded phone calls between Appellant and Tiffany while he was in jail. The State called the apartment complex manager, the responding police officers, and the investigating detective to testify.
The State also offered without objection the testimony of two expert witness. The first expert was L. Galvan, a registered nurse certified as a sexual assault examiner. Viewing the photographs of Tiffany's injuries, Galvan's testimony indicated that the injuries on Tiffany's neck were consistent with strangulation.
The State also offered the testimony of M. Bassett, a licensed professional counselor who specializes in domestic violence. She testified that it is not uncommon for domestic violence victims to request charges be dismissed against the abuser. Bassett stated that a victim may later say that the she lied about the allegations and that the abuse did not occur. She explained the dynamics of domestic abuse and the reasons that a victim may recant the allegations.
Tiffany appeared in court on the second day of trial, indicating that she wanted to testify. The State requested that counsel be appointed to represent her because it understood that she planned to testify that the assault did not occur. The State wanted Tiffany to be advised of the potential legal consequences of providing testimony showing that she had filed false police report. The trial court agreed, and counsel was appointed to represent Tiffany.
Tiffany testified that Appellant did not assault her. She said that she had a "panic attack" that morning related to various stresses in her life. Tiffany testified that she "lost it," started swinging at Appellant, and throwing things in her apartment. She said that Appellant tried to calm her down and prevent her from punching the walls. Tiffany testified that the bruises seen in the police photographs were self-inflicted. She specifically denied that Appellant struck her, choked her, or dragged her.
Tiffany stated that she made the police report out of anger. She also testified that she had reported other assaults by Appellant to the police out of anger. She stated that charges related to all those reports had been dismissed.
Appellant testified in his own defense. Like Tiffany, he testified that he had not assaulted her in any way. Instead, he stated that Tiffany had been "hysterical" and "started swinging at [him] for no reason." Appellant said that he tried to leave, and Tiffany tore his clothing. He stated, "I know I have a history and they're going to think, oh, he hit her because my history." Appellant acknowledged that he had been previously convicted for assaulting Tiffany.
As rebuttal evidence, the State offered the recording of a phone call that Appellant made to Tiffany from jail following his arrest for the instant offense. In the recording, Appellant continually tells Tiffany how bad he is being made to look by the evidence even though he is innocent. He tells her that it is good that she is on his side and that the jury will see that. Tiffany indicates in the call that she has told the State that Appellant is not pressuring her to recant, and she states that she was "not in her right mind." She tells Appellant that her car is not working and that she does *397 not have the money to pay for it. Appellant tells her that he needs to get out of jail so that he can help her.
The defense then recalled Tiffany to testify. She stated that Appellant did not pressure her to testify and that she was testifying on her "own volition." She testified that she wished that she had never called the police.
After hearing the parties' arguments, the jury found Appellant guilty of the offense of family-violence assault. Appellant chose to have the trial court assess his punishment, and the court sentenced Appellant to four years in prison.
This appeal followed.
Jury Question
When defense counsel asked prospective jurors whether they needed "to hear from the victim in order to convict on a family violence case," the trial court sustained the State's objection that the question was an improper commitment question. In his sole issue, Appellant contends that the trial court erred when it sustained the State's objection, disallowing the question.
A. Standard of Review
The trial court has broad discretion over the process of selecting a jury. Barajas v. State , 93 S.W.3d 36, 38 (Tex. Crim. App. 2002). Therefore, appellate courts should not disturb a trial court's ruling on the propriety of a particular question during voir dire absent an abuse of discretion. Id. ; Allridge v. State , 762 S.W.2d 146, 167 (Tex. Crim. App. 1988). An abuse of discretion occurs when a proper question about a proper area of inquiry is prohibited or when an improper question is allowed to be asked. See Barajas , 93 S.W.3d at 38 ; Atkins v. State , 951 S.W.2d 787, 790 (Tex. Crim. App. 1997). "To constitute an abuse of discretion, the trial court's voir dire limitation must render the defendant's trial fundamentally unfair." Jacobs v. State , 560 S.W.3d 205, 212 (Tex. Crim. App. 2018).
B. Analysis
Appellant asserts that his question, asking prospective jurors whether they needed "to hear from the victim in order to convict on a family violence case," was not an improper commitment question as the State had asserted in its objection sustained by the trial court. Improper commitment questions are prohibited "to ensure that the jury will listen to the evidence with an open mind-a mind that is impartial and without bias or prejudice-and render a verdict based upon that evidence." Sanchez v. State , 165 S.W.3d 707, 712 (Tex. Crim. App. 2005). Commitment questions "require a venireman to promise that he will base his verdict or course of action on some specific set of facts before he has heard any evidence, much less all of the evidence in its proper context." Id.
"The Court of Criminal Appeals has articulated a three-part test for determining whether a voir dire question is an improper commitment question." Delacerda v. State , 425 S.W.3d 367, 381 (Tex. App.-Houston [1st Dist.] 2011, pet ref'd) (citing at Standefer v. State , 59 S.W.3d 177, 179-84 (Tex. Crim. App. 2001) ). First, the trial court must determine whether a particular question is in fact a commitment question. See Standefer , 59 S.W.3d at 179. Second, if it is a commitment question, then the court must decide whether it is nevertheless a proper commitment question. See id. at 181. To determine whether the question is a proper commitment question, the court first inquires whether one of the possible answers to the question gives rise to a valid challenge for cause. Id. at 181-82. If it does not, then the question is not proper and should be disallowed by *398 the trial court. See ids="9458516" index="13" url="https://cite.case.law/sw3d/59/177/#p179">id. Third, if the commitment question gives rise to a valid challenge for cause, then the court must determine whether the question contains only those facts necessary to test whether a prospective juror is challengeable for cause. Id. at 182.
1. Was the question a commitment question?
"Commitment questions are those that commit a prospective juror to resolve, or to refrain from resolving, an issue a certain way after learning a particular fact." Id. at 179. Often, a commitment question will elicit a "yes" or "no" response, but a question can be open-ended and still be considered a commitment question if "the question asks the prospective juror to set the hypothetical parameters for [his or her] decision-making." Id. at 179-80.
Here, the disputed question asked prospective jurors whether they could convict under a specific factual scenario: no testimony from the complainant. See ids="9458516" index="17" url="https://cite.case.law/sw3d/59/177/#p179">id. We agree with the State and conclude that the question was a commitment question. See id. at 183 ; see also Delacerda , 425 S.W.3d at 382 (concluding that question asking venire whether it could convict without physical evidence was commitment question). However, whether the question was proper requires further inquiry to determine if the question could give rise to a valid challenge for cause.
2. Did the question give rise to a valid challenge for cause?
Appellant points out that, before voir dire, the State informed the trial court that Tiffany was not cooperating and may not testify for the prosecution. Appellant claims that, even if it was a commitment question, the disputed question was proper because it would have informed the defense about the prospective jurors' "views on [the] types of evidence" necessary to convict him. Appellant asserts the question would have assisted the defense in deciding whether to call Tiffany to testify if she did not testify for the State. However, Appellant does not offer any argument to show how the question would have resulted in a valid challenge for cause, a necessary element for a commitment question to be proper. See Standefer , 59 S.W.3d at 181-82.
A prospective juror may be challenged for cause if he possesses a bias against a phase of the law on which the State or defendant is entitled to rely. See TEX. CODE CRIM. PROC . art. 35.16(b)(3) ; Delacerda , 425 S.W.3d at 382. A prospective juror may be properly challenged for cause when the juror would hold the State to a burden of proof higher than the beyond-a-reasonable-doubt standard. See Coleman v. State , 881 S.W.2d 344, 360 (Tex. Crim. App. 1994) ; Delacerda , 425 S.W.3d at 382 ; see also Blackwell v. State , 193 S.W.3d 1, 20 (Tex. App.-Houston [1st Dist.] 2006, pet. ref'd) ("[A] juror who would require more evidence than necessary to prove a case beyond a reasonable doubt would be subject to a challenge for cause."). For example, a prospective juror is properly subject to challenge for cause if he indicates that he could not convict based on the testimony of one witness, even if he believed that witness beyond a reasonable doubt. Lee v. State , 176 S.W.3d 452, 460 (Tex. App.-Houston [1st Dist.] 2004), aff'd , 206 S.W.3d 620 (Tex. Crim. App. 2006) (citing Castillo v. State , 913 S.W.2d 529, 533 (Tex. Crim. App. 1995) ). "However, a prospective juror is not challengeable for cause merely for setting his or her threshold for reasonable doubt higher than the minimum required by law, e.g., a prospective juror who would require the testimony of more than one witness in order to *399 be convinced beyond a reasonable doubt." Id.
Here, the challenged question sought to determine only whether prospective jurors could convict Appellant of family-violence assault in the absence of testimony by the complainant. The question did not seek to determine whether the prospective jurors could convict Appellant in the absence of the complainant's testimony even if the State otherwise proved the elements of the offense beyond a reasonable doubt. Cf. Delacerda , 425 S.W.3d at 382 (reasoning that prospective juror who could not convict defendant in absence of "physical evidence," even if the State otherwise proved elements of offense beyond reasonable doubt, was subject to valid challenge for cause).
The commitment question here would not give rise to a valid challenge for cause. Before the trial court may sustain a challenge for cause on the ground that the venire person will not convict without the complainant's testimony, "it must be demonstrated to the trial court that the venire person's categorical refusal is predicated upon something other than his understanding of proof beyond a reasonable doubt." Castillo , 913 S.W.2d at 534. "Otherwise, there is no indication the [venire person] cannot follow the law," and the party making the challenge will fail to carry its burden to show the venire person should be excused. Id. Here, the disputed question, as asked, would not have elicited an answer indicating that a venire person could not follow the law. See Lee , 206 S.W.3d at 622 (recognizing that, in Castillo , Court of Criminal Appeals held that simple question "[c]ould you find someone guilty on the testimony of one witness?" was an improper commitment question because it would not give rise to valid challenge for cause).
Because the disputed question did not give rise to a valid challenge for cause, we conclude that the record supported a determination by the trial court that the question was an improper commitment question.[2] See Standefer , 59 S.W.3d at 181-82. We hold that the trial court properly exercised its discretion by sustaining the State's objection and disallowing the challenged question.
We overrule Appellant's sole issue.
Conclusion
We affirm the judgment of the trial court.

The Supreme Court of Texas, pursuant to its docket-equalization authority, transferred this appeal from the Third Court of Appeals in Austin to this Court. See Tex. Gov't Code § 73.001 ("The supreme court may order cases transferred from one court of appeals to another at any time that, in the opinion of the supreme court, there is good cause for the transfer.").

Because we have determined that the disputed commitment question would not lead to a proper challenge for cause, we need not proceed to the third part of Standefer test to determine whether the question contains only those facts necessary to test whether a prospective juror is challengeable for cause.