**Reversed and Remanded and Opinion filed May 27, 2021.**



In The

# Fourteenth Court of Appeals

## NO. 14-19-00388-CR

### DEMEKAYLA DAQUIS DURDEN, Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the 179th District Court**
**Harris County, Texas**
**Trial Court Cause No. 1491520**

## OPINION

In seven issues, appellant Demekayla Durden challenges her murder conviction that resulted in a 35-year prison sentence. She asks that we render an acquittal for insufficient evidence, or alternatively, that we remand for a new trial based on charge error or jury misconduct. The record contains undisputed evidence that appellant delivered the complainant's mortal wounds, and legally sufficient evidence that appellant intended to inflict those wounds. In this regard, the jury was free to discredit the hearsay statement that complainant was trying to

rape appellant. Unlike the jury, the court in charging the jury was not free to discredit that testimony. With respect to the charge error, she complains of the trial court's refusal to correct the application paragraphs in the self-defense portion of the charge, "sexual assault" or "aggravated sexual assault", rather than murder.

Guided by two drastically different standards of review applicable to the respective issues, we overrule appellant's sufficiency challenge, but sustain her charge-error challenge. We reverse the conviction and remand for a new trial.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Since 1958, Carlotta Alexander and her brother Paul Alexander, called home the house at 8754 Cowart Street in the Pleasantville neighborhood in Houston (Alexander House). They continued living there together after their mother passed. Carlotta and another sister described Paul as generous to a fault, thoughtful, considerate, very family-oriented.[1]

Appellant and Travis Florence also lived in Pleasantville, at 8703 Pattibob, just over a quarter mile from the Alexander House.

On the night of December 9, 2015, Travis observed Paul sitting lifeless in his own living room. Travis came upon Paul after his sometimes-live-in girlfriend, appellant, called for Travis to meet her between the Alexander House and the house he sometimes shared with appellant. Travis says that when he encountered appellant in between the houses she was wearing a T-shirt with "[a] lot of blood" on it, and was "kind of nervous," "in shock." Travis reports that at that point appellant told him that Paul had "tried to rape her and so she killed him."[2]

---

[1] Among other descriptions of his character, Paul's sisters described accounts where Paul would drive them to work, learned how to clean lights on tractor trailers and would assist at the local truck stop to help truck drivers see the road.

[2] Although his answers to the attorney's questions produced several varied iterations of

Prompted by his disbelief with all or some part of appellant's account, Travis agreed to walk with appellant to the Alexander House. It was then that Travis saw the complainant Paul Alexander dead on the couch. Neither appellant nor Travis reported Paul's death to authorities that night.

At 3:10 am on December 10, 2015, Carlotta came home to the Alexander House to find the porch light off, blood on the couch, and a burned curtain laying on the bathroom covered in soot and soaking wet; Paul and his car missing. She called their sister, Anne Balthazar, to come over. While waiting for Anne, Carlotta turned on the porch light, which illuminated for Ann when she arrived to the house, blood in Paul's parking spot and blood-trails from the parking spot to house. Subsequently, Anne and Carlotta were unsuccessful in locating him through calls to area hospitals, so they called 9-1-1.

Roughly three hours after Carlotta arrived home, Houston Police Department (HPD) patrol officers responded to the sister's missing person report. Patrol officer Zane Brumley observed the pool of blood leading from the driveway into the home to the front door. Brumley followed the trail of blood into the home and discovered more blood in the house, including blood on the living-room couch, and found the living room (but generally no other rooms) in a state of disarray. Tthe patrol officers contacted homicide division.

Brumely assisted in securing the scene after the homicide investigators arrived. In the course of securing the entire house, Brumely noted that only items in the living area appeared to be disturbed, and that it appeared that a struggle may

---

appellant's statement, it appears that the first statement appellant told Travis was that Paul had "tried to rape her." In most instances he described her characterization of Paul's act as an attempt, that Paul *tried* to rape her, but he refused to agree that appellant made the statement that she was 'trying to get Paul off her' or that she used such words as 'defending' herself, or 'acting in self-defense.' In one instance Travis states, "What she told me, the man tried to – the man rape her, and she killed the man."

3

have occurred in the living room.

Another HPD patrol officer, Scott Dalton, responded to the call and after observing the scene, headed to a sludge pit on the 1300 block of Maxine to look for the vehicle; he knew from patrolling the area for years this area was frequently used as a dumping site. Dalton located Paul's car and called for backup. Officer Dalton and other officers found Paul's lifeless body in the backseat.

Forensic analyst Kelly Anders arrived at the sludge pit and collected DNA evidence from complainant's body. Other investigators collected DNA evidence at the Alexander house, including items found in the house, such as gloves and brass knuckles.

The next day statements were taken from appellant, Travis, and appellant's cousin, Jaworski Durden. Based on the review of the crime scene, the body, and these statements, the HPD investigators decided to charge appellant with murder. Jaworski, like Travis, would later testify at trial that appellant had beckoned him on the night of the murder and that he had seen appellant on the night of the murder wearing a shirt with blood stains. Investigators collected buccal swabs from appellant, Jaworski and Travis.

A later medical examination conducted by Dr. Morna Gonsoulin, assistant medical examiner at the Harris County Instituted of Forensic Science, revealed that Paul's body had nineteen sharp force injuries, including strikes to the head, neck, chest, abdomen and upper extremities, once piercing the right internal jugular vein. Gonsoulin determined the wounds to Paul's body were consistent with those inflicted by a knife or other unknown sharp object. Dr. Jason Wiersema, the Director of Forensic Anthropology and Emergency Management at the Harris County Institute of Forensic Sciences, reviewed the evidence collected, and explained that the injuries were consistent with injuries inflicted by a knife,

4

including a kitchen knife.

Appellant was indicted for murder by intentionally or knowingly causing the death of Paul Alexander with a knife or sharp object, and alternatively, for unlawfully intending to cause serious bodily injury to Paul Alexander and causing his death by intentionally and knowingly stabbing him with a knife or sharp object. Appellant pleaded not guilty.

Although appellant did not testify and presented no evidence in her case-in-chief, throughout the trial appellant's counsel conveyed a singular theory of his client's case as an act of self-defense to prevent Alexander from raping her. During voir dire, he asked jurors if they could apply the law of self-defense as applied to an attempted rape and acquit appellant if they determined she killed Paul to prevent him from raping her. In opening statement, he promised the following evidence and testimony—

> She says when she went to Paul's house, the two of them sat; and he was going to get some fruit and cut up some fruit and come back out. And he was calling her sugar baby and speaking with her and that he had his penis out of his zipper, and he wanted her to suck his penis. And she said, no, Paul, that's not happening. I'm not going to do it. And she says it smelled real bad.

> And she said Paul put the knife on the table and sat down next to her and started to come on to her, started to grab her and feel on her. And she said no multiple times; and he wouldn't stop, that he grabbed her arms and that she grabbed the knife off of the kitchen table and they struggled with the knife. They struggled with the knife in that area near the sofa, near where the coffee table was that the knife was on.

> They struggled, and the coffee table flipped over; and then she stabbed him multiple times and just doesn't remember. But she was trying to get him to stop, trying to get him off of her. She knew and thought rape was about to happen because she said no, and he continued and pressed on.

> So, immediately after this happened, Miss Durden, in a situation she

5

had never been in before, calls Travis Sullivan (sic), someone she knows. And the first thing she tells Travis is that, he tried to rape me and I was trying to get him off of me.

Although this particular account was not borne out in the trial evidence, Travis testified that appellant told him that Paul had tried to rape her, so she killed him. Forensic investigators confirmed that appellant's DNA could not be excluded from one of Paul's fingers and his back pocket and agreed that Paul's zipper was half-way down. The medical examiner also testified that Paul was a heavy drinker, a social drinker, and that her examination revealed his blood-alcohol level was ".36".

The charge included extensive instructions on self-defense, but the application paragraphs read as if the appellant asserted self-defense to protect herself from Paul committing a murder rather than sexual assault or aggravated sexual assault. Appellant's counsel objected and the judge denied the objection:

> *MS. CROWELL:* Our next and final objection is on Page 13 of the jury charge, the final paragraph that starts with, If you find from the evidence beyond a reasonable doubt that at the time and place in question the defendant did not reasonably believe that she was in danger of death or serious bodily injury or the imminent commission of murder by Paul Alexander. And we would object to the fact that this is inconsistent with the presumption charge, which says that the defendant can use deadly force if she is faced with an attempted sexual assault. So, we are concerned that this is going to confuse the jury about what their job is, about what the law is on this issue and will, in turn, deny our client due process of law.
>
> *MR. DAVIS:* And, Judge, just to add, we think it should say, to prevent the commission of the sexual assault or attempted sexual assault, which is in the statute, saying a person has a right to use self-defense in those circumstances. This limits the circumstances in which a person can use self-defense to just murder or imminent commission of murder, and the statute covers more than just murder. So, we say the way it's written right now, it's a comment on the evidence, Judge. The charge is a comment on the evidence and denies our client due

6

process by not properly instructing the jury on the law.

*THE COURT:* Okay. Well, thank you very much. And your request is denied. And as mentioned to the parties earlier, I think the self-defense statute sometimes can be very confusing to the jury. So, it's this Court's hope that both sides will either break it down and make the law simplistic to them -- and I want the record to reflect that indeed the statute and this charge, because it does charge the statute, does contain the exception with regards to aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery or aggravated robbery.

And let the record further reflect that upon voir dire, Mr. Davis' presentation to the jury on voir dire, it was -- I think he did a very good job in educating the jury with respect to the exception of sexual assault. So, is there anything else?

In closing, appellant's counsel continued to argue the self-defense theory, and suggested that the self-defense theory also negated the intent element of the murder offense, explaining that by stabbing Paul her intention was not to murder Paul, but to merely get Paul off of her. The state noted in closing that it had not presented much evidence of appellant's motive, and supplied a theory that appellant was trying to rob Paul, in part based on evidence that lotto tickets were seen found on the living room floor and appellant's DNA evidence could not be excluded from Paul's back pocket.

The jury found appellant guilty as charged and assessed punishment at thirty-five years' confinement.

## II. ISSUES AND ANALYSIS

Appellant raises seven issues: a duo of sufficiency-of-the-evidence complaints, one preserved charge-error complaint, two unpreserved charge-error complaints, and one jury misconduct complaint. The State raises one cross-complaint pertaining to the court's refusal to permit certain commitment questions in voir dire. We first address the issues that could afford appellant the greatest

appellate relief (e.g., her sufficiency-of-the-evidence complaints), and then move on to the remaining complaints. After addressing her preserved-charge error question and remanding for a new trial we proceed to the State's cross-issue.

## A. Sufficiency of the Evidence

In her first issue appellant complains that the state failed to present proof of the essential elements of the charged offense—murder with a deadly weapon. In her second issue, she complains the state failed to rebut her affirmative defense of self-defense.

### 1. Standard of Review

In evaluating a challenge to the sufficiency of the evidence supporting a criminal conviction, we view the evidence in the light most favorable to the verdict. *Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000). The issue on appeal is not whether we, as a court, believe the State's evidence or believe that appellant's evidence outweighs the State's evidence. *Wicker v. State*, 667 S.W.2d 137, 143 (Tex. Crim. App. 1984). The verdict may not be overturned unless it is irrational or unsupported by proof beyond a reasonable doubt. *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991). The jury "is the sole judge of the credibility of the witnesses and of the strength of the evidence." *Fuentes v. State*, 991 S.W.2d 267, 271 (Tex. Crim. App. 1999). The jury may choose to believe or disbelieve any portion of the witnesses' testimony. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986). When faced with conflicting evidence, we presume the jury resolved conflicts in favor of the prevailing party. *Turro v. State*, 867 S.W.2d 43, 47 (Tex. Crim. App. 1993). Therefore, if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, we must affirm. *McDuff v. State*, 939 S.W.2d 607, 614 (Tex. Crim. App.

8

1997).

We measure sufficiency to support a conviction by comparing the evidence presented at trial to "the elements of the offense as defined by the hypothetically correct jury charge for the case." *Malik*, 953 S.W.2d at 240. A hypothetically correct jury charge reflects the governing law, the indictment, the State's burden of proof and theories of liability, and an adequate description of the offense for the particular case. *Id.*

**2. Is the evidence sufficient to support the jury's finding that appellant intended to cause Paul's death?**

A person commits the offense of murder if she intentionally or knowingly causes the death of an individual. Tex. Penal Code Ann. § 19.02(b)(1), (2) (West 2011). Alternatively, she also commits the offense when she intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. *Id*. at § 19.02(b)(2). Travis's testimony that appellant told him that she killed complainant is sufficient proof that appellant killed complainant.

A person acts with intent with respect to the nature of her conduct or to a result of her conduct when it is her conscious objective or desire to engage in the conduct or cause the result. Tex. Penal Code Ann. at § 6.03(a) (West 2011). She acts knowingly with respect to the nature of her conduct (or to circumstances surrounding her conduct) when she is aware of the nature of her conduct (or that the circumstances exist). *Id*. at § 6.03(b). She acts knowingly with respect to her conduct when she is aware the conduct is reasonably certain to cause the result. *Id*.

Intent, being a question of fact, is in the sole purview of the jury. *Brown v. State,* 122 S.W.3d 794, 800 (Tex. Crim. App. 2003). A jury may rely on collective common sense and common knowledge when determining intent. *Ramirez v. State,*

9

229 S.W.3d 725, 729 (Tex. App.–San Antonio 2007, no pet.). Intent also may be inferred from the circumstantial evidence surrounding the incident, which includes acts, words, and conduct of the accused. *See* Tex. Code Crim. Proc. Ann. art. 38.36(a) (West 2005); *Patrick v. State,* 906 S.W.2d 481, 487 (Tex. Crim. App.1995).

"Attempts to conceal incriminating evidence, inconsistent statements, and implausible explanations to the police are probative of wrongful conduct and are also circumstances of guilt." *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004). Based on Travis's testimony that he saw Paul's body lifeless in the living room, observed bloodstains indicating that Paul's body was dragged into his car, the fact that Paul's car, harboring his body, had been taken to the "sludge pit"— a place known as one where people abandon things, and appellant's DNA was not excluded from DNA found on Paul's body and clothes, a jury could reasonably infer that appellant was attempting to conceal evidence of wrongful conduct, thus evidencing her intent. The jury could also infer that appellant discarded the deadly weapon that matched Paul's wounds. The jury could further have inferred intent from appellant's statement to Travis, her attempts at concealment, and her failure to contact law enforcement. *See id.*

Finding sufficient evidence that appellant intentionally committed an act clearly dangerous to Paul's life which brought about his death, we overrule appellant's first issue.

**3. Is the evidence sufficient to support the jury's rejection of appellant's self-defense theory?**

In resolving the sufficiency-of-the-evidence issue, we look not to whether the State presented evidence that refuted evidence of self-defense, but rather we determine whether, after viewing all the evidence in the light most favorable to the

prosecution, any rational trier of fact would have found the essential elements of murder beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt. *See Saxton v. State,* 804 S.W.2d 910, 914 (Tex. Crim. App. 1991); *Hernandez v. State,* 309 S.W.3d 661, 665 (Tex. App.–Houston [14th Dist.] 2010, pet. ref'd). A person is justified in using deadly force against another when and to the degree the person reasonably believes the deadly force is immediately necessary to prevent the other's imminent commission of sexual assault. Tex. Penal Code § 9.32(a)(2)(B) (West 2011).

To the extent that appellant relies on her charge error challenge in the context of the hypothetically correct jury charge, we conclude even a proper self-defense charge does not conclusively establish each of the elements of her self-defense. The jury was free to disbelieve appellant's statement to Travis, or was free to interpret from his testimony – "that he thought she was lying" – that Travis believed appellant when she said she killed Paul, but not that Paul was sexually assaulting her. See *Dearborn v. State*, 420 S.W.3d 366, 374 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (reviewing the sufficiency of evidence to support aggravated assault where justification defense was raised by appellant's statement admitted into evidence which sets out his self-defense "does not conclusively prove a claim of self-defense.").

We conclude from the evidence that a rational jury could have concluded beyond a reasonable doubt that appellant intentionally or knowingly caused appellant's death using a knife or sharp object, and was not justified in using deadly force. *See id*.; *see also Fountain v. State*, 604 S.W.3d 578, 582 (Tex. App.—Houston [14th Dist.] 2020, no pet.).

**B. Charge Error**

In her third issue, appellant argues that the court erred in failing to instruct

the jury regarding the right to use deadly force in self-defense to prevent the other's imminent commission of sexual assault. The State does not dispute that there was error in the form of the court's charge on self-defense, but contends that any error was harmless because appellant was not entitled to the instruction. As a threshold issue, we first address the State's argument.

The State argues if appellant was not entitled to the self-defense instruction, any error with respect to its form would be harmless. Relying on *Hughes v. State*, the State suggests the inclusion of the instruction for self-defense of murder as opposed to self-defense for sexual assault could not have contributed to the jury's guilty finding. *See Hughes v. State*, 897 S.W.2d 285, 301 (Tex. Crim. App. 1994) ("the inclusion of a mitigating evidence instruction which permitted the jury to answer no to any of the special issues could not have contributed to the jury's affirmative findings on the issues"). Presuming such a rule would apply to this case, we disagree with the conclusion that appellant was not entitled to the instruction.

As discussed above, in the previous section, the evidence supporting the self-defense to prevent commission of a sexual assault was not conclusive; nor was it overwhelming. The question here is whether there was some evidence to support the self-defense instruction. Regardless of the strength or credibility of the evidence, a defendant is entitled to an instruction on any defensive issue that is raised by the evidence. *Jordan v. State*, 593 S.W.3d 340, 343 (Tex. Crim. App. 2020) citing *Hamel*, 916 S.W.2d at 493. A defensive issue is raised by the evidence if there is sufficient evidence to support a rational jury finding as to each element of the defense. *Shaw v. State*, 243 S.W.3d 647, 657–58 (Tex. Crim. App. 2007)("[A] defense is supported (or raised) by the evidence if there is some evidence, from any source, on each element of the defense that, if believed by the

12

jury, would support a rational inference that that element is true."). We view the evidence in the light most favorable to the defendant's requested defensive instruction. *Gamino v. State*, 537 S.W.3d 507, 510 (Tex. Crim. App. 2017) (*citing Bufkin v. State*, 207 S.W.3d 779, 782 (Tex. Crim. App. 2006)). A trial court errs in refusing a self-defense instruction if there is some evidence, viewed in the light most favorable to the defendant, that will support its elements. *Gamino*, 537 S.W.3d at 510.

A person is justified in using deadly force against another when and to the degree the person reasonably believes the deadly force is immediately necessary to prevent the other's imminent commission of sexual assault. Tex. Penal Code § 9.32(a)(2)(B) (West 2011).[3] In light of the very limited evidence demonstrating any other motive appellant had to stab Paul, a jury may have reasonably concluded that Paul was taking steps (beyond mere preparation) to sexually assault appellant, crediting appellant's statement that appellant was trying to rape her, the existence of appellant's DNA on Paul's fingertip, a permissible inference from the circumstantial evidence that Paul began to undress himself based on his partially unzipped pants. *Hackbarth v. State*, 617 S.W.2d 944, 946 (Tex. Crim. App. 1981) (finding evidence of attempted sexual assault where appellant grabbed the complainant, attempted to remove her clothing and exposed his penis).

The State contends that the trial court lacked evidence of the appellant's "state of mind". Citing the 1984 Court of Criminal Appeals *Smith v. State* case, the State insists that record must contain evidence of appellant's state of mind at the time of the act of purported self-defense. 676 S.W.2d 584, 587 (Tex. Crim.

---

[3] A person commits an offense of attempted sexual assault if, with specific intent to commit a sexual assault, he does an act amounting to more than mere preparation that tends but fails to effect commission of the sexual assault. § 15.01(a). A person commits sexual assault among other ways, by causing the penetration of the mouth of another person by the sexual organ of the actor, without that person's consent. § 22.011(a)(1)(B).

App. 1984). The state then follows with a string of parenthetical case citations to unpublished opinions from our sister courts involving scenarios where a defendant was not entitled to a self-defense instruction without evidence of his state of mind. These cases do not affect our analysis because our record does contains some, albeit not particularly strong, evidence that appellant reasonably believed deadly force was immediately necessary to prevent Paul's imminent commission of sexual assault, and because the cases cited are factually distinguishable from our case in ways material to the analysis. Some of the cases involve facts germane to the defendant's state of mind that are remarkably incompatible with fear or apprehension of their respective complaints.[4] In some of the cases, the only evidence of the defendant's state of mind reveals the act as retaliation rather than self-defense.[5] There is no evidence that appellant was acting in retaliation. If appellant did act in retaliation, we cannot see where this was revealed in the record.

Moreover, contrary to the State's argument, we conclude the trial record contains evidence of appellant's state of mind applicable to the analysis—her

---

[4] *Arevalo v. State*, 01-19-00085-CR, 2020 WL 3968671, at *2 (Tex. App.—Houston [1st Dist.] Mar. 24, 2020, pet. ref'd) (observing that there was some evidence that appellant (appealing domestic assault conviction) had been scratched by complaint but concluding "no evidence showed appellant had a reasonable belief that his use of force was immediately necessary to protect himself."); *Garcia v. State*, 05-12-01693-CR, 2014 WL 1022348, at *7 (Tex. App.—Dallas Mar. 13, 2014, pet. ref'd) (finding defendant was not entitled self-defense instruction where defendant effectively denied fear or apprehension of unarmed complainant charging at him).

[5] *Ivy v. State*, 07-15-00023-CR, 2016 WL 6092524, at *3 (Tex. App.—Amarillo Oct. 17, 2016, no pet.) (noting defendant's actions—begging complainant not to leave and following complainant to the home that complaint took refuge from defendant—as 'not the actions of one who is in fear of an assault by the other person"); *Reynolds v. State*, 07-11-00500-CR, 2012 WL 6621317, at *4 (Tex. App.—Amarillo Dec. 19, 2012, no pet.) (court explained that appellant's own statement that complaint's act of kicking him caused him to "snap" and strike her as an act of retaliation not self-defense); *Daisy v. State*, 05-01-01791-CR, 2002 WL 31528723, at *2 (Tex. App.—Dallas Nov. 15, 2002, no pet.) (same).

reasonable belief that her use of force was immediately necessary to prevent Paul from raping her. See Tex. Penal Code § 9.32(a)(2)(B). Her statement to Travis, '*Paul tried to rape me'*, is evidence that she believed Paul tried to rape her. By saying "Paul tried to rape me", she was effectively revealing that during their encounter, she did not consent to have sex with Paul and believed that Paul knew that and was undeterred by her lack of consent. Appellant called Travis for help. Travis testified that appellant was "startled" or "nervous" or "in shock" when he encountered appellant, and on one occasion when asked about it, Travis testified that the first thing she told him was that Paul tried to rape her, and this was the basis for her mental state. (*Q.* And she seemed startled, true? *A.* A little bit, like, the man tried to rape me."). A jury could reasonably conclude from Travis's testimony, that appellant's behavior was specifically associated with the attempted rape (rather than the murder) and fairly consider appellant's behavior and statements to Travis as a continuation of and a reflection of her state of mind in regard to Paul's alleged attempted sexual assault. *See Smith v. State*, 676 S.W.2d 584, 587 (Tex. Crim. App. 1984) (considering as relevant to the analysis defendant's statement about the facts of the offense to a third party immediately after the occurrence).

Beyond her statement to Travis, appellant pointed to roughly ten other facts in the trial record as evidence offered supporting the self-defense instruction. The State addressed these facts in its brief, making valid points with respect to the relevance and speculative nature of some facts, and contending that some of these "bare fact[s]" do not alone create an inference of self-defense. While it is true enough that none of these facts are conclusive on the issue and are susceptible of alternate interpretations, appellant has pointed to facts that nonetheless aid in establishing the circumstances that make self-defense plausible: DNA on Paul's

15

fingertips could be consistent with Paul grabbing appellant; Paul's blood alcohol level indicating that Paul was under the influence of alcohol lends to the possibility of unrestrained or uncharacteristic behavior, testimony noting that Paul's pants were partially unzipped could indicate preparation to sexually assault; that Paul was much larger than appellant and in good shape for  man of  his age could explain the reasonableness of the degree of force used to prevent a sexual assault.

In summary, appellant was entitled to a self-defense instruction. Here, we consider if there was harmful error in the form of that instruction.

## 1.  Standard of Review

In a criminal case, we review complaints of jury charge error in two steps. *Cortez v. State*, 469 S.W.3d 593, 598 (Tex. Crim. App. 2015). First, we determine whether error exists in the charge. *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005). Second, we review the record to determine whether sufficient harm was caused by the error to require reversal of the conviction. *Id.*  The degree of harm necessary for reversal depends on whether the appellant preserved the error by objecting to the charge. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g).

## 2. The court's erroneous jury charge.

The purpose of the trial court's jury charge is to instruct the jurors on all of the law applicable to the case. *Vasquez v. State,* 389 S.W.3d 361, 366 (Tex. Crim. App. 2012); Tex. Code Crim. Proc. art. 36.14. The application paragraph is the portion of the jury charge that applies the pertinent penal law, abstract definitions, and general legal principles to the particular facts and the indictment allegations. *Vasquez,* 389 S.W.3d at 366. Therefore, a jury charge with an application paragraph that incorrectly applies the pertinent penal law to the facts of a given

case is erroneous. *Cortez v. State*, 469 S.W.3d 593, 598 (Tex. Crim. App. 2015); *Mendez v. State*, 545 S.W.3d 548, 553–54 (Tex. Crim. App. 2018)("we have found jury-charge error where a trial court fails to apply its abstract charge on self-defense to the particular facts of the case at hand").

Although the court included an abstract statement of law tracking the entirety of the 'deadly force in defense of a person' statute (Tex. Penal Code § 9.32), listing all of the offenses a defendant might be justified in preventing, ("aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery"), that section only included a definition for the offense of murder, and consistently, the application paragraphs narrowed the jury's consideration only to the prevention of murder—a theory not supported by the evidence at trial. Moreover, the court's charge excluded from the jury's consideration the theory for which there was some evidence: self-defense to the prevention of a sexual assault. Because the court plainly failed to apply the relevant penal law to the facts of this case, the charge is erroneous. See *Mendez v. State*, 545 S.W.3d 548, 553–54 (Tex. Crim. App. 2018) ("we have found jury-charge error where a trial court fails to apply its abstract charge on self-defense to the particular facts of the case at hand").

**3. Does the record show that appellant suffered "some harm" from the court's charge error?**

Because appellant properly preserved error in the charge with regard to the application paragraph for self-defense, a reversal is mandated if a review of the record yields a finding that appellant suffered "some harm." *Reeves,* 420 S.W.3d at 816 (citing *Almanza,* 686 S.W.2d at 171). The actual degree of harm must be assessed in light of "(1) the jury charge as a whole, (2) the arguments of counsel, (3) the entirety of the evidence, and (4) other relevant factors present in the

record." *Id.*

## *a. Entire Charge*

In determining whether a charge error is egregiously harmful, we first consider whether a reasonable jury referring to other parts of the charge would find a correct statement of the law or would instead be confused or misled. *Uddin v. State*, 503 S.W.3d 710, 717 (Tex. App.—Houston [14th Dist.] 2016, no pet.). Looking to the entire seventeen-page charge, twelve pages are devoted to the issue of self-defense. The first pages of the charge describing the murder-with-a-deadly-weapon offense are straight-forward.

The subsequent twelve pages on self-defense include two separate sections (each containing abstract law and application paragraphs). The first section contains abstract instructions for self-defense to protect the actor against the use or attempted use of unlawful deadly force followed by application paragraphs for that manner of self-defense. This section generally tracks section 9.32(a)(1) & (2)(A). The first section is not particularly problematic, but it is confusing that this section is repeated entirely in the next section. *Reeves v. State*, 420 S.W.3d 812, 818 (Tex. Crim. App. 2013).

The second set of self-defense instructions addresses occurrences when a defendant reasonably believes deadly force is immediately necessary "to protect herself against the other person's use or attempted use of unlawful deadly force" or "to prevent the other's imminent commission of aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery." This section generally tracks section 9.32(a)(1), (2)(A), (2)(B), and (b). But this list can only provide cold comfort to appellant—while in theory a jury could see that a self-defense for sexual assault was legally authorized, it is doubtful that the jury disregarded the application paragraph that precluded her defense and was so

empowered by the abstract law tracking the statute that it disregarded the application paragraphs that effectively excluded that theory of self-defense from the case. This is because just further down in the abstract section, the court includes a definition of "murder".[6] Yet there is no definition for "sexual assault", "aggravated sexual assault" or any of the other listed offenses for which one may be justified in preventing with deadly force. Thus, before reaching the application paragraphs, the jury was already being lead astray.

The complete 222-word and 111-word application paragraphs[7] read as follows:

> Therefore, if you find from the evidence beyond a reasonable doubt that the defendant, Demekala Daquis Durden, did stab Paul Alexander with a deadly weapon, as alleged, but you further find from the evidence, as viewed from the standpoint of the defendant at the time, that from the words or conduct, or both of Paul Alexander it reasonably appeared to the defendant that her life or person was in danger and there was created in her mind a reasonable expectation or fear of death or serious bodily injury from the use of unlawful deadly force at the hands of Paul Alexander, **or a reasonable expectation or fear of the imminent commission of the offense of murder at the hands of Paul Alexander**, and that acting under such apprehension and reasonably believing that the use of deadly force on her part was immediately necessary to protect herself against Paul Alexander's use or attempted use of unlawful deadly force **or Paul Alexander's imminent commission of murder,** she stabbed Paul Alexander, then you should acquit the defendant on the grounds of self-defense; or if you have a reasonable doubt as to whether or not the defendant was

---

[6] Unlike the charged offense, the description of murder does not include language or an instruction relating to the use of a 'deadly weapon'.

[7] In *Reeves*, the Criminal Court of Appeals, suggested that 156 and 125 words were excessive. ("That first application paragraph contains 156 words in one sentence. The second paragraph contains 125 words in one sentence. Neither is comprehensible."). For those that tally, the total words of the first one-sentence paragraph in this case exceed the total words in the first paragraph in *Reeves*, and the total words between the both one-sentence application paragraphs in this case exceed the total of both paragraphs in Reeves significantly.

acting in self-defense on said occasion and under the circumstances, then you should give the defendant the benefit of that doubt and say by your verdict, not guilty.

If you find from the evidence beyond a reasonable doubt that at the time and place in question the defendant did not reasonably believe that she was in danger of death or serious bodily injury **or the imminent commission of murder by Paul Alexander,** or that the defendant, under the circumstances as viewed by her from her standpoint at the time, did not reasonably believe that the degree of force actually used by her was immediately necessary to protect herself against Paul Alexander's use or attempted use of unlawful deadly force **or against Paul Alexander's imminent commission of murder,** then you should find against the defendant on the issue of self-defense.

Putting aside the primary issue, that the paragraphs include the wrong offense, the wording is not concise; it is duplicative and confusing. Other than the language bolded above, these two paragraphs repeat the application paragraphs in the first self-defense section.

Apart from the application paragraphs, the structure of the abstract paragraphs leads to the same conclusion: that the jury could only consider evidence of Paul's attempt to murder appellant (which did not exist), and not consider evidence of sexual assault, for which there was no legal definition and which is excluded from the application paragraph. The abstract paragraph tracking the penal code lists sexual assault and aggravated sexual assault, but in the paragraphs that follow defining relevant terms, the only legal definition provided is the definition for murder as committed by the complainant. These defects in the structure of the abstract legal portion of the charge magnified the harm in the application paragraphs. See *Elizondo v. State*, 487 S.W.3d 185, 203 (Tex. Crim. App. 2016) (noting that physical location of erroneous provocation paragraph magnified harm); see also *Reeves v. State*, 420 S.W.3d at 819.

20

Moreover, because the definition of "murder" has no place in the self-defense instruction in this case, and because "murder" also happens to be the offense with which appellant was charged, a juror might confuse and rely upon the description of "murder" in the self-defense paragraph, which is not accompanied by a "deadly weapon" instruction, as providing a sufficient description of the charged offense.[8] This effectively would permit the jury to convict appellant for the charged offense without making a deadly weapon finding. *Uddin v. State*, 503 S.W.3d at 718 *citing Cada v. State*, 334 S.W.3d 766, 774, 776 (Tex. Crim. App. 2011) (holding due process requires State to prove beyond reasonable doubt every element of offense alleged, and it cannot substitute alternative element it did not allege). Similarly, the charge only authorizes deadly force against Paul in defense of Paul's deadly and murderous conduct, not for committing or attempting to commit sexual assault. Sexual assault and aggravated sexual assault are distinguishable from both murder and deadly force in that the sexual assault offenses do not incorporate deadly force. Thus, the charge as submitted effectively elevates the defense's burden of proof to include an additional element not required by statute: to prove that Paul was engaged in deadly conduct.

In addition to the misapplication of the law to the facts of the case, the duplicity and lack of definitions applicable to sexual assault compound rather than correct the charge error. *Reeves v. State*, 420 S.W.3d at 820. This factor suggests harm resulted from the erroneous charge.

### b. Trial Evidence

Although there was sufficient evidence to convict appellant, this is not a rare

---

[8] Note the verdict form reads: "We, the Jury, find the defendant, Demekala Daquis Durden, guilty of murder, as charged in (the indictment.)"

case with conclusive evidence on each element, nor evidence that was so overwhelming that the erroneous self-defense instruction was harmless. *Reeves v. State*, 420 S.W.3d at 820. The fact that there is significant evidence showing commission of the act does not ameliorate the charge error. *Reeves v. State*, 420 S.W.3d at 820. The entirety of the evidence weighs in favor of a finding of some harm. *Elizondo v. State*, 487 S.W.3d 185, 203 (Tex. Crim. App. 2016) (finding some harm in charge error even when there was evidence inconsistent with appellant's self-defense theory).

### c. Jury Arguments

Appellant relied on self-defense as her exclusive defensive theory at trial. In closing, the State attempted to characterize appellant's strategy as composed of varied theories, including a theory that appellant was entirely uninvolved with the murder. But the record does not lead us to that conclusion.

This is not a case where the State amplified the charge error by calling attention to it in closing. But nor do we find this case one, as the trial judge may have suggested in overruling appellant's charge objection, where the problem could be resolved through counsel's discussion of the charge.

During arguments, both sides focused on the self-defense theory of the case as a defense to prevent Paul's sexual assault of appellant. To the extent that either side gained ground in clarifying the charge in closing arguments or appeared to liberate the jury from the narrowing constraints of the application paragraphs, or otherwise empowered the jury to consider that an acquittal was available based on the self-defense theory to prevent sexual assault, the court effectively nullified these efforts in statements made to the jury before and during closing argument. Before reading the charge the judge described it as "the law that you must follow in this case". During argument in resolving objections to misstatements of the law,

22

the court stated, "I gave you the law, and that's the law that you shall follow."

On balance, this factor is neutral, neither showing the error to be harmful or harmless. *See Elizondo v. State*, 487 S.W.3d at 209. (finding this factor neutral when the subject of the error retains a role in argument, but the error itself is not brought to the front of the jurors' minds).

### *d. Other relevant information from the record*

The record shows that the charge error resulted in some harm to appellant because her entire case was based on her theory of self-defense to prevent Paul's sexual assault (or aggravated sexual assault) such that this was the only contested issue and the court's charge effectively deprived the jurors' consideration of that theory, making the rejection of that defense inevitable. *See Jordan v. State*, 593 S.W.3d 340, 347 (Tex. Crim. App. 2020) ("The record in this case demonstrates some harm because the only contested issue was self-defense, and the failure of the self-defense instructions to reference "Royal or others" made rejection of the defense inevitable."). Accordingly, we sustain appellant's challenge in her third issue.

### C. State's Cross-Complaint

The State may appeal rulings on questions of law when a convicted defendant appeals. Tex. Code Crim. Pro. art. 44.01(c). Contingent on our reversal and remand for new trial, the State has asked that we resolve the trial court's ruling in voir dire, preventing the State from asking a question it characterizes as a commitment question.

A commitment question is one that commits a prospective juror to resolve, or refrain from resolving, an issue a certain way after learning a particular fact. *Hernandez v. State*, 390 S.W.3d 310, 315 (Tex. Crim. App. 2012). For a

commitment question to be proper, it must meet two criteria: (1) "one of the possible answers to that question must give rise to a valid challenge for cause"; and (2) it "must contain only those facts necessary to test whether a prospective juror is challengeable for cause." *Standefer v. State*, 59 S.W.3d 177, 182 (Tex. Crim. App. 2001). We consider two questions the State sought to ask the venire panel:

> [Prosecutor (*First Question*)]: So, here's my question to you: If the defendant made a statement and you knew that statement was made, is there anybody here that would want or would require me to play that statement before you could convict?
>
> [Defense counsel]: And, Your Honor, that is just an improper—
>
> The Court: That is sustained, and you better move on.
>
> [Prosecutor (*Second Question*)]: Okay. Why—if I have proven my elements beyond a reasonable doubt but there is this statement out there of the defendant, would anyone increase my burden and make me play that statement?
>
> [Defense counsel]: Again, Your Honor.
>
> The Court: Do you have an objection?
>
> [Defense counsel]: Yes, Your Honor.
>
> The Court: That's sustained. I said to move on.

The State's burden of proof in a criminal case is to prove each element of the offense beyond a reasonable doubt. Tex. Penal Code § 2.01. A juror is challengeable for cause if the juror, while believing the State has proven all the elements beyond a reasonable doubt, would require more evidence before convicting. *Lee v. State*, 206 S.W.3d 620, 624 (Tex. Crim. App. 2006).

The first question is improper as a commitment question on its face, because it does not, without more, give rise to a valid challenge for cause. The question *did not* seek to determine whether the prospective jurors could convict appellant in the absence of some evidence *even if* the State otherwise proved the elements of the

24

offense beyond a reasonable doubt. *See Sandoval v. State*, 571 S.W.3d 392, 399 (Tex. App.—Houston [1st Dist.] 2019, no pet.). The second question does not contain the same flaw.

Yet like the first question, the second question contains another problem in the context of the record and briefing in this case—uncertainty concerning the status of the purported "statement." What exactly are we talking about? Was the statement legally obtained, available along with a sponsoring witness for the State to use at its strategic discretion to play (or not play) at trial? Could the State reasonably anticipate the appellant's counsel to make vague references to the statement while asserting her right not to testify?

Our record does not make clear the status of the statements.[9] A motion to suppress was filed relating to the statement, but we have no record of a hearing or ruling on the motion. If there was an agreement concerning the terms of the statement's use, that is not in our record either. Needless to say, a trial judge, after making the appropriate evidentiary rulings, and aware of the status of the statements is better served to make this determination.

Because the State has not, in its briefing, made the status of this statement clear, we cannot say whether the questions contain only those facts necessary to test whether a prospective juror is subject to challenge for cause. That is, there are circumstances, where any reference to such a statement would be improper, and thus beyond what is necessary to challenge a prospective juror for cause. But we can imagine in some circumstances, such a reference would be permissible.

Thus, having jurisdiction to consider the argument, we overrule the State's

_____

[9] We do however acknowledge that during closing arguments, counsel for both sides utilized the fact that appellant's statement that was not presented to the jury as a 'skunk in the jury box', noting the existence of the statement and making vague references as to its significance.

cross complaint.

### III. CONCLUSION

The trial court's judgment is reversed, and the case is remanded for a new trial.


/s/    Randy Wilson
Justice

Panel consists of Justices Zimmerer, Poissant, and Wilson.

Publish — Tex. R. App. P. 47.2(b).